MONTREUIL ET AL., f. p. c. *vs.* PIERRE, f. m. c.

APPEAL FROM THE COURT OF PROBATES FOR THE PARISH AND CITY OF
NEW-ORLEANS.

If no original whatever of a notarial act can be found in the office of the
notary, a copy certified by him, with his seal appended, would still be
admissible in evidence, and have effect, because it must be presumed

from the official character of the notary, to be a copy of an original, which once existed.

The loss or destruction of the original act will rather be presumed or supposed, than that the notary was guilty of forgery, in giving a certified copy of an act that never existed.

MONTREUIL
ET AL., f. p. c.
*vs.*
PIERRE, f. m. c.

Where a person of color alleges he is free, and has been so for many years, he will be allowed to avail himself of any legal evidence in his favor, under this plea, without being bound by the pleadings to specific proofs.

This suit was instituted by Bazile Montreuil *alias* Bazile Dédé and Charlotte his wife, and Jeanne Dédé, f. p. c., to recover the estate of one François Montreuil *alias* Louis Dédé. They allege that they are the only ligitimate brother and sister of the deceased Louis Dédé, but that one Charles Pierre, a negro, claims the estate, in virtue of a nuncupative will, purporting to have been made the 13th of April, 1834, in which he, the said Pierre, is instituted sole and universal heir and legatee, and testamentary executor of said will, which has been ordered to be executed accordingly by the Court of Probates. The plaintiffs further allege, that the said will is null and void, because being only attested by three witnesses, and one of them not residing in the parish, at the time of signing. 2. That Charles Pierre, the pretended legatee and testamentary executor, was born a slave, and has never been legally emancipated.

They pray that the will be annulled; the order for its execution rescinded; that they be declared the legal heirs, and Charles Pierre be directed to surrender the estate of the decedent into their hands.

The defendant pleaded the general issue, and also set up his claim under the will, and that he had accepted the succession of the deceased. He further averred, that he was free, and had been in the constant enjoyment of his freedom for the last twenty-four years, and more. He avers that the will is valid, and prays that he be dismissed with his costs.

In a supplemental petition the plaintiffs further alleged, that the bequest made in the will to Charles Pierre was

EASTERN DIST.
*April,* 1836.

MONTREUIL
ET AL., f. p. c.
*vs.*
PIERRE, f. m. c.

simulated, and a substitution for the benefit of certain natural children of the testator, &c., which rendered the provisions of the will null, as being illegal and forbidden by law.

The defendant died soon afterwards, and the suit was carried on against his surviving wife and widow, Desirée Carrière, a free woman of color. The latter likewise filed her petition in the Court of Probates, claiming the estate and inheritance of her late husband, Charles Pierre, and praying that an inventory be made thereof, and that she be put in possession.

Shortly after these proceedings commenced, one Rosette Devillier, a woman of color, presented her petition to the Court of Probates, alleging that she was originally a slave, belonging to Madame Jumonville Devillier, and had since obtained her freedom. But while a slave, on the 1st September, 1797, she had a son, who was baptised by the name of Charles, and called Charles Pierre, the same whose estate and inheritance is claimed by his widow, Desirée Carrière ; that her son being born a slave, she afterwards, in the year 1807, purchased him from the executors of Madame Jumonville Devillier, for the sum of five hundred dollars, and that he remained her slave from that period to his death, by reason of which, his succession and property of every description belonged to her, which she prays may be so decreed, accordingly.

The widow and administrator admitted Charles Pierre was the son of the plaintiff, Rosette Devillier, but denied that he was ever her slave, and averred he was free, and had been in the constant and uninterrupted enjoyment of his freedom, for the last twenty-seven years before his death, &c. ; that his surviving wife is his heir, and as such entitled to his estate.

Upon these issues the parties went to trial. The two cases were consolidated and tried together.

In support of the claim of freedom set up by Charles Pierre and his representative, a document was offered in evidence, purporting to be a copy of an authentic act, passed

in 1807, before Pierre Pedesclaux, notary public, in New-
also Bernard, was purchased from the executors of Madame
Jumonville Devillier, for the sum of five hundred dollars,
paid by his mother, Rosette Devillier, and in the same act
he is emancipated and set free. The evidence also showed,
he had lived and enjoyed the rights of a free person of color,
uninterruptedly, ever since.

The counsel for the plaintiffs took a bill of exceptions to
the introduction of this paper in evidence, " on the ground,
that the said copy is not dated; that there is not, in the
records of Pierre Pedesclaux, for the year 1807, any complete
act from which the aforesaid copy could have been taken;
but that there is the project of an act, dated August 13, 1807,
entirely and literally similar to the above copy, but not
signed by any body, and having on the contrary the word
'null' written at the foot of it, in the hand writing of the
said Pierre Pedesclaux, which project the plaintiff contends,
was the original of the aforesaid paper, offered by the defend-
ant, and that, therefore, the last mentioned paper being an
incorrect copy, and not the copy of a notarial act, ought to
be rejected; and also on the ground, that notarial acts
ought to be recorded in regular books, to affect third persons;
that it appears that the book of acts passed by Pierre Pedes-
claux, in 1807, was so regularly kept, that no pages are
wanting in the same, and that there is no act in the said
record, bearing any resemblance to the aforesaid copy, except
the said project of August 13, 1807; but the court admitted
said paper, on the ground that the copy offered by the
defendant, bears the signature and the seal of the late Pierre
Pedesclaux, formerly a notary of this place. The court
further observes, that the grounds of opposition stated by the
plaintiffs' counsel, inasmuch as they relate to facts as by him
above stated had not been by him substantiated, by previous
proofs of said facts, except with regard to the existence of a
*project* of acts, containing verbatim the same as the copy now
introduced and objected to, and which is to be found at page
506 *recto* of the minutes of the late Pierre Pedesclaux, for

EASTERN DIST.  the year 1807, which project bears no signature of either
*April,* 1836.  parties, notary or witnesses."

MONTREUIL       The probate judge rendered judgment sustaining the will
ET AL., f. p. c.  and Charles Pierre's inheritance under it; and also that he
*vs.*
PIERRE, f. m. c.  was free, and in favor of the claim of his widow to take his
succession. From this judgment the plaintiffs in both suits
appealed.

*Louis Janin*, for the plaintiffs.

These two cases depend upon nearly the same facts and
the same questions of law, and have therefore been argued
together, both in the Probate Court and in this court.  The
pleadings present only two questions, viz: 1st. Was Charles
Pierre free at the date of the testament or not?  In the
former hypothesis the plaintiffs in both cases will be non-
suited; in the latter Charles Pierre could receive nothing
under the testament, (article 1462,) which therefore would
be void on account of the incapacity of the legatee, and the
property claimed as his estate, was really the property of his
owner, his natural mother.  2d. Even if he had been free when
the testament was executed, it would not be valid, if, as is
alleged by the plaintiffs in the first case, one of the witnesses
to it was not a resident of the parish where it was made.

1. The evidence very clearly establishes, that Charles
Pierre was born and baptised in 1797, and that Rosette
Devillier, his mother, was then the slave of Madame Jumon-
ville Devillier.  Some time afterwards she was emancipated.
In 1806 or 1807, Madame Jumonville Devillier died; in
the latter year her three testamentary executors sold Charles
Pierre to his mother.  This is proved by two of the grand
children of Madame Jumonville, viz: Madame Hutchet
Kernion and Mr. Coulon Jumonville, whose evidence will
be found on page 41 of the record.  They well recollect the
sale, which was made with the consent of the family.  No
act of sale is produced, but a receipt, dated, July 4th, 1807,
and signed "Moulon," by which Moulon acknowledges to
have received from Rosette Devillier, for Mr. Jumonville, one

of the executors, the sum of five hundred dollars. This receipt is explained by the witnesses.

2. They saw her counting this money, and accompanied her when she carried it to Moulon, for the purpose of paying it for her son. One of them saw her counting it to Moulon, heard the conversation that then took place, and saw Moulon giving her a receipt for it. From that time, Charles Pierre staid with his mother. This sale took place and was perfected during the prevalence of the Spanish law, by which even a parole sale of immoveables is valid, if accompanied by possession. 6 *Martin, N. S.,* 257. 7 *Martin, N. S.,* 321. 8 *Martin, N. S.,* 197. 3 *Louisiana Reports,* 107.

3. The defendants offered at the trial a paper in evidence, purporting to be a copy of a notarial act, of August 13, 1807, by which the testamentary executors of Madame Jumonville Devillier, emancipated Charles Pierre, in consideration of the sum of five hundred dollars, paid by his mother. This paper is signed by Pierre Pedesclaux, notary public; it is in the hand writing of one of Pedesclaux's clerks, who has been dead many years, but it is without date, and not certified a true copy. *Page* 18 *and* 19 *in Rosette Devillier's case, and* 54 *in the other case.* It was admitted by the court, and the plaintiffs took a bill of exceptions. It can clearly have no effect, in the decision of this case, for the original of this pretended copy never had existence. In the records of the notarial acts of Pierre Pedesclaux, an act is found bearing the same date as the paper in question, and agreeing with it word for word, but having no signature whatever, and having written under it the word "null," in Pedesclaux's hand writing. The alleged copy, on the other hand, states that the original was signed by the three executors, two witnesses and the notary. This imperfect act, is no doubt the original of the but too perfect copy. The simple inspection of the original record, affords convincing proof, that it cannot be otherwise; there is no leaf wanting in the whole book; the manner in which the acts were written, on quires, would render such a defect immediately perceptible, and it is in evidence, that

46

EASTERN DIST.
*April,* 1836.

MONTREUIL
ET AL., f. p. c.
*vs.*
PIERRE, f. m. c.

Pedesclaux never wrote his acts on detached sheets of paper. The pretended copy is therefore a nullity; of itself it has no force or effect. See *Civil Code, page* 308, *article* 235. The Spanish law differs but little, but is rather more strict than ours. 1 *Tapia,* 228. 4 *Tapia,* 159, 162, 190. How this copy came to be made, when, by, and to whom it was delivered, the defendants have not explained. The plaintiffs offered to prove by Rosette Devillier, the circumstances attending the purchase of her son, but she was rejected upon the grounds stated in the bill of exceptions, on page 47, and which are believed to be wholly untenable.

4. It would be nugatory to follow the defendants in their attempt to prove that possibly another original of this copy may have existed. It was incumbent upon them clearly to prove its existence and loss, *Civil Code of* 1808, *page* 308, *article* 235; and in this they have completely failed.

5. There are many other objections to the introduction of this copy. It is in direct contradiction with the pleadings, it is not certified a true copy, and were it an original it would be null and void; for by the Spanish law, an act of emancipation, had to be attested by five witnesses. *Bazzi* vs. *Rose,* 8 *Martin's Reports,* 149.

*J. Seghers,* for the defendant.

1. According to the provisions of the Spanish laws, a mother could not buy her son, and afterwards keep him as her slave; and she has no claim on his succession for the price she gave for him. *Partida* 2, *title* 29, *law* 12. *Febrero Adicionado,* (edition of 1807,) *part.* 2, *lib.* 2, *cap.* 2, *sec.* 1, *No.* 31.

2. Pursuant to the same laws, a slave acquires his freedom, *ipso facto,* when his master holds him out as free, and allows him to marry a free person, in his presence, and with his consent. *Partida* 4, *title* 5, *law* 1. *Ibid.,* *title* 22, *law* 5.

3. Ten years' possession of freedom, in the presence of the master, were necessary under the laws of Spain, to entitle the slave to freedom by prescription. 5 *Martin's Reports,* 566.

EASTERN DIST.
*April,* 1836.

MONTREUIL
ET AL., f. p. c.
*vs.*
PIERRE, f. m. c.

4. The above laws were repealed by the sweeping act of 1828; but it has been contended in the court below, that they had been repealed long before, viz: in 1807, by the general law, enacted " to regulate the conditions and forms of the emancipation of slaves." This position is not correct. On the contrary, we find that particular laws are not repealed by a subsequent general law, containing different provisions. To produce that effect, the provisions of those laws must be incompatible. 10 *Martin's Reports,* 172, *De Armas's case.* 3 *Martin, N. S.,* 190.

5. The case of Meilleur *vs.* Couprey, 8 Martin, N. S., 128, has been relied upon by the plaintiff; but even admitting this case to be law, *which is doubted,* it matters not; for the law regulating the emancipation of slaves, though approved on the 9th of March, 1807, did not go into operation before the 1st of September of the same year, (see *section* 8,) when Charles Pierre had already been emancipated, and the price of his freedom paid for by his mother.

6. The character of the notary standing unimpeached, his office being proved to have been kept in very bad order, and the copy produced on the trial being very old, the presumption is, that the original has been lost, and that the copy was handed to Charles Pierre by his own mother. *Civil Code, page* 309, *articles* 234, 235. *Louisiana Code, articles* 2247, 2248. 5 *Martin's Reports,* 405. 7 *Martin, N. S.,* 548, *Tate* vs. *Penn.*

7. The allegations in the answer are sufficient; and besides, the above copy was introduced in evidence, without being objected to on that score. 6 *Martin, N. S.,* 86.

8. The surviving wife is called to the inheritance, and preferred to all the *natural relations* of the husband, except those of the descending line. 6 *Louisiana Reports, Victor* vs. *Tagiasco.*

9. According to the French and Spanish jurisprudence, the *copia* or *expedicion* needs not be certified as being true copies, nor is it necessary to put a date to it: "*y no dada por concuerda,* como algunos practicon por ignorancia." "Por lo

EASTERN DIST.
April, 1836.

MONTREUIL
ET AL., f. p. p.
vs.
PIERRE, f. m. c.

que *solo dándolas en año diverso*, deberá añadir en la suscripcion la fecha del en que las da." *Febrero Adicionado, part.* 1, *cap.* 19, *sec.* 1, *Nos.* 11, and 13. *Nouveau Dénisart, vol* 8, *verbo Expédition*, page 319. *Ibid.*, vol. 4, *verbo Collation de pièces*, page 592.

*Magnin* and *Fourchy*, for the plaintiff, Rosette Devillier, contended, that the judgment of the Probate Court should be reversed, as being contrary to law, and that judgment should be rendered for the plaintiff, on the following grounds:

1. *Charles Pierre* was born a slave, and cannot be considered free, *unless* duly emancipated, according to the provisions of law established and required in such cases.

2. He has never been emancipated legally, and therefore, died a slave.

3. The plaintiff in this case, being the true and legal owner of Charles Pierre, is entitled to his succession.

4. The prescription alleged by defendants, to establish the freedom of Charles Pierre, cannot avail them, because the time required for such prescription did not run during the lapse of time, or the number of years requisite for such prescription.

5. The defendants have not alleged in their defence, that they intended to establish his (Charles Pierre) freedom, otherwise than by prescription, and the alleged enjoyment by him, of the said alleged freedom.

6. The defendants, therefore, cannot be admitted to prove said freedom, otherwise than agreeably to their allegation, and are precluded from the right of resorting to written instruments.

7. The act purporting to be the emancipation of *Charles Pierre*, should it be valid in itself, cannot invalidate the prohibition of the law to have slaves emancipated, except under certain exigencies duly complied with.

8. Prescription, again, (if any there be, which is denied,) cannot avail them, because it is a maxim of *public rights* (*droit public*,) that *prescription cannot run against the sovereign* (*nulla prescriptio contra principem*.)

9. The *sovereign*, in a republican state like this, is the *law* which has provided that slaves can in no case be emancipated, without strict compliance with the legal requirements provided by law.

Eastern Dist.
*April,* 1836.

MONTREUIL
et al., f. p. c.
vs.
Pierre, f. m. c.

10. The act purporting to be the emancipation of Charles Pierre, is a mere nullity; nothing else but a sheet of paper, and must therefore be completely disregarded; no *signature* at the foot of the *original*, and the word "*null*," in the hand writing of the notary, at the foot of the same.

11. The judgment of the court below, does not mention that the word "*null*" is of the proper hand writing of the notary, as established by the testimony. In this respect it is erroneous.

*Louis Janin,* on the same side, in conclusion.

1. The contestation between the parties in relation to the copy of the act of emancipation, produced by the defendants, on which their case depends, resolves itself into two questions, viz: 1st. Did the original of this pretended copy ever exist, or was the copy not rather delivered through error, when the original was indeed never executed? The defendants have completely failed in their attempts, to prove the existence and loss of the original; the contrary is very evident. 2d. Can this copy of itself make proof, or are the defendants not bound to produce the original, or prove its existence and loss, when the genuineness and correctness of the copy is impeached? The solution of this question can present no difficulty; notarial records would be of no use, if copies produced the same effect as the originals. A copy attested by a notary is presumed to be genuine, until it is impeached; but it can certainly be questioned, for otherwise parties would be the helpless victims of the frauds and mistakes which might be committed by notaries.

2. The Spanish law is not, and could not be different from ours, in relation to the credit to be given to copies. The Spanish law recognised three sorts of public instruments, viz: 1st. The *protocolo*, the origin and fountain of all the

EASTERN DIST.
April, 1836.

MONTREUIL
ET AL., f. p. c.
vs.
PIERRE, f. m. c.

copies, (*copias ó traslados*) the use of which was introduced to ascertain and verify the correctness of the latter. 1 *Tapia*, 227 *and* 228.  *Curia Phillippica, folio* 91, *No.* 31. 2d. *La copia* original, which was taken from the *protocolo*, and attested by the notary, before whom the original had been executed, who certified, that the act of which he delivered the copy *had been executed before him.*  1 *Tapia*, 229, (he cites *Partida* 3, *title* 18, *lib.* 54.)  3d. The "*traslado*," which was the copy taken from the *copia original,* 1 *Tapia*, 230.

3. The defendants have cited Febrero Adicionado, part. 1, cap. 19, sec. 1, Nos. 11 and 13.  These paragraphs are the same as paragraphs 10 and 12, on pages 229 and 230 of the first volume of *Tapia.*  The first of them says, that the "*copia original,*" must not be certified "*por concuerda,*" but attested according to law 54, title 18, part 3, that is, the notary must attest that the act was passed before him.  The second states, that of certain acts the notary before whom they were executed, can give to the parties interested as many copies as they may require that all the copies taken by that notary from the *protocolo,* and having the proper form, are "*copias originales,*" and that not only within the year in which the act was passed, but at any subsequent time, *that* notary could give copies certified like *copias originales,* and not "*por concuerda.*"  Some notaries were of opinion, that they could give *copias originales* only within the year, and that after that time they could only give copies certified "*por concuerda.*"  This error is refuted by Febrero, who adds, that if the copy is given in another year, the date on which it is delivered must be added.  From this last expression, the defendants have hastily inferred, that if the copy is given within the year, it need have no date, which is no where said by Febrero, who, on the contrary, asserts, (1 Tapia, 231,) that the law requires the copies to be in the same form, at whatever time they are delivered.  Febrero only meant to say, that it ought always to have its proper date.  Applying the preceding explanations of Febrero to the copy in question, we find that it has not the attestation

of a *copia original.* If it is not a *copia original,* but an ordinary copy, (*trasunto* or *traslado,*) it ought to be certified, "*por concuerda.*" This certificate is also wanting. But whether it be the one or the other, it ought to have a date. The defendants contend, that because it has no date, it must be presumed to be a "*copia original,*" and to have been executed within the year of which the act bore date. But it has already been shown, that this pretension is inadmissible, and indeed it involves this absurdity, that because a copy is deficient in one of the usual, and certainly essential requisites of copies, a higher character and greater effect must be given to it, than if it contained this requisite. From this it follows, that nothing authorises us to suppose that it was executed while the Spanish law was in force. Its character must, therefore, be decided by the Civil Code, page 309, articles 234 and 235. According to those articles, copies to make proof, must be certified conformable to the record, and even if so certified, they are without effect if they are proved to be incorrect. The copy in question, is not certified as article 234 requires, and would, therefore, under no circumstances dispense with the production of the original ; and the plaintiffs have, besides, proved that it is incorrect.

4. Leaving this point, it may be laid down as an unquestionable principle of the Spanish law, that no kind of copy can make proof, if it is not conformable to the original, and that its incorrectness may always be shown. 4 *Tapia,* 159, *No.* 79. *Ibid. page* 190, *No.* 17. 1 *Tapia,* 228, *Nos.* 9 *and* 229, *page* 10. *Curia Phillippica, page* 9, *No.* 31, *and page* 92, *No.* 33. The law on this subject is very clearly summed up, in *Teatro de la Legislacion, volume* 17, *pages* 9 *and* 10, *verbo. Instrumentos.*

5. The defendants contend, that by the Spanish law, a parent could not hold his child in slavery. The contrary is very distinctly asserted in Valsain *vs.* Cloutier, 3 Louisiana Reports, 176, and clearly appears from *lib.* 1, *title* 10, *part* 4. The defendants rely on *part* 2, *title* 29, *lib.* 12. That whole title does not contain one word on slavery, but speaks only of prisoners of war.

Eastern Dist.
April, 1836.

MONTREUIL
ET AL., f. p. c.
vs.
PIERRE, f. m. c.

*Henry H.*

MONTREUIL
ET AL., f. p. c.
*vs.*
PIERRE, f. m. c.

*Bullard, J.,* delivered the opinion of the court.

The first of these actions was instituted by the heirs at law of one François Montreuil, f. m. c., to cause to be declared null and void his testament, by which the original defendant, Charles Pierre, a man of color, was instituted his heir, and appointed executor, on the grounds : 1st. That one of the witnesses was not a resident in the parish, when the testament was made ; and 2d. That the instituted heir was a slave, and consequently, under a legal incapacity to take by will. The defendant put in an answer, maintaining the validity of the testament on both grounds, and especially alleging that he was free, and had been in the undisputed enjoyment of his freedom for more than twenty years. Before this issue was tried, the defendant died without children ; but having a widow, who therefore came forward to be admitted as his heir at law, and made herself a party to the original suit. She maintained the validity of the will, and the freedom of her deceased husband. There are other incidents to this proceeding, which it is not necessary to detail. About the same time, Rosette Devillier, f. w. c., the mother of the deceased Charles Pierre, came forward and presented her petition in the Probate Court, claiming the estate of her son, adversely to his widow, except so far as it depended on the will of Montreuil, on the ground that Charles Pierre was her slave, by purchase from his former mistress, or her executors.

After a trial in the Court of Probates, the validity of the will was sustained on both grounds, and the freedom of Charles Pierre recognised, and the original plaintiffs, together with Rosette Devillier, appealed.

The two cases have been twice argued in this court, and we have bestowed upon them our most serious attention. It must be confessed, they present a novel and repulsive spectacle. A mother, whose son is shown to have died in the undisputed condition of a free man, except so far as this suit is concerned ; who had enjoyed *de facto* that condition in her presence, for a series of years ; who had married a free woman with the assent of his mother, now comes forward, after his death, to claim the fruits of his industry, on the

allegation that her son lived and died her slave; that he was a mere thing, incapable of acquiring property, or of taking or transmitting any thing by inheritance. Such pretensions must be rigorously scrutinized; for while we are forced to admit, that the relation of mistress and slave may exist between the mother and her child, as a necessary result of her legal capacity to purchase, and his liability to be sold as a thing in commerce, yet when her title rests upon purchase, she must show that her intention was, not merely to ameliorate the condition of her child, by redeeming him from the authority of his master, but to hold him in the same condition, with a right to sell him again, and subject to the payment of her debts, or to be transmitted to her heirs.

It is clear, that Charles Pierre was born the slave of Jumonville, and that at the age of twelve years, to wit: in 1807, and before the act of the legislature prohibiting the emancipation of slaves before the age of thirty years, had began to operate, he passed from the power of his former master, under the control of his mother. The nature of the contract, by which this change in his condition was effected, forms the principal difficulty in this case. On the part of Charles Pierre, it is contended, that for a sum of five hundred dollars, paid by the mother, he was emancipated by the executors of Madame Jumonville; but the mother contends, that she purchased him as a slave, and paid for him as such, the sum of five hundred dollars.

To prove the emancipation of Charles Pierre, who was known also by the name of Bernard, the defendants offered in evidence, a document purporting to be a copy signed by P. Pedesclaux, under his notarial seal, of an act passed before Pedesclaux, on the 13th of August, 1807, by which the executors of Madame Jumonville declare, that they have in their possession, as her slave, a little negro named Bernard, aged about twelve years, free from incumbrances, and they declare that they give his liberty, to said Bernard, in consideration of the sum of five hundred dollars, paid to them by his mother, Rosette Devillier; desisting from all claims and

47

EASTERN DIST.
*April*, 1836.

MONTREUIL
ET AL., f. p. c.
*vs.*
PIERRE, f. m c.

right of property, upon him, in favor of himself; that he might thenceforward enjoy all the prerogatives attached to free persons. This act appears by the copy to have been signed by the executors, and two witnesses. The introduction of this document was opposed, on the ground that the said copy is not dated, and that there is not in the records of Pierre Pedesclaux for the year 1807, any complete act from which said copy could have been taken, but that there is the *projet* of an act, dated August 13th, 1807, entirely and literally similar, but not signed by any body, and having on the contrary, the word " null," written at the foot of it, in the hand writing of the notary, which *projet*, it was contended, was the original of the aforesaid papers, which being an incorrect copy, and not the copy of a notarial act ought to be rejected; and, also, on the ground that notarial acts ought to be recorded in regular books, to affect third persons; that it appears that the book of acts passed by Pierre Pedesclaux in 1807, was so regularly kept that no pages are wanting in the same, and that there is no act in the said record bearing any resemblance to the aforesaid copy, except the said *projet*. The court admitted the paper, on the ground that it bears the signature and seal of the notary; and the judge adds, in the bill of exceptions, signed by him, that the grounds of objection stated by the plaintiffs' counsel, so far as they relate to facts, as by him stated above, had not been substantiated by previous proof of said facts, except with regard to the existence of a *projet* of an act as above spoken of, in the register of the notary, without the signature of either of the parties, notary or witnesses.

In considering this bill of exceptions, we are bound to inquire into the admissibility of the document in question, according to the proof of facts previously administered, to destroy the presumption of its being a genuine copy of an authentic act arising from the certificate of the notary. The only facts which appear to have been so proved, according to the certificate of the judge, were, that there existed in the register of Pedesclaux for the year 1807, a *projet* of an act, exactly similar, but without the signatures of parties, wit-

nesses or notary, and that the copy is without date. The want of date to the copy, we do not consider of any importance, and may be laid out of view.

The objection in substance is, that the instrument offered is false or forged; not merely that it is not a true copy, but that no such original or protocol ever existed; and we are asked to infer this from the negative fact, that no such protocol, signed by the parties and witnesses, is found in the office of the notary, after a lapse of nearly thirty years, and from the positive fact, that a mere *projet* is produced of similar date and context, but not completed by the signatures of the parties. If no original whatever could be found, in the office of the notary, it appears to us, that a copy, certified by the notary, would still be admissible in evidence; because it must be presumed, from the official character of the notary, to be a copy of an original which once existed. If the evidence stopped there, it would be insufficient to exclude the copy; for we are rather to suppose the loss or destruction of the protocol, than that the notary was guilty of a forgery.

How is the case varied, when coupled with the other fact, that there does exist on the register, an original *projet* of an act of the same tenor?

According to the Spanish law, in force when this transaction took place, the *instrumento* was divided into three kinds, or rather degrees: the *registro*, the *original* and the *traslado*. The *registro* or *protocol* was kept by the notary, as the form from which the *original* was transcribed; the *original* was in fact a copy from the *protocol*, certified by the notary, and the *traslado* a copy not of the *protocol*, but of the *copia original*. The document in question purports to be the *copia original*. The authorities cited by the plaintiffs' counsel from Febrero, do not, as we understand them, carry the doctrine so far as he contends for, and authorise the court to presume, that no such act was ever passed, upon such proofs as have been exhibited in this case. Great faith was attached to the official acts of notaries, and Gregorio Lopez, in his commentaries on the 9th law, 19th title, of the 3d Partida, says that when the instrument is ancient, and the notary dead, it

EASTERN DIST.
*April*, 1836.

MONTREUIL
ET AL., f. p. c.
*vs.*
PIERRE, f. m. c.

If no original whatever of a notarial act can be found in the office of the notary, a copy certified by him, with his seal appended, would still be admissible in evidence, and have effect, because it must be presumed from the official character of the notary, to be a copy of an original, which once existed.

The loss or destruction of the original act will rather be presumed or supposed, than that the notary was guilty of forgery, in giving a certified copy of an act that never existed.

EASTERN DIST.
April, 1836.

MONTREUIL
ET AL., f. p. c.
vs.
PIERRE, f. m. c.

will be presumed that a *protocol* once existed, though none can be produced: "*Si verò instrumentum scriptum esset antiquum et tabillio jam mortuus, videratur standum instrumento sumpto, licet de protocollo non appareat, cum presumi debeat præcessisse ex temporis diuturnitate.*"

The fact that the notary wrote the word "*null*" under the imperfect act, did not render the act more null than it was before; and it might be fairly argued, that the notary wrote it for some purpose, and perhaps for the purpose of indicating to his clerks, that another had been signed in lieu of it. Certainly the existence of such a *projet* furnishes some proof that the notary was directed by the parties to prepare such an instrument; and the fact that from that period till the death of Charles Pierre, the family of Jumonville disisted from setting up any claim to him, strengthens the presumption of the genuineness of an original. We are therefore of opinion, that the court did not err in admitting the copy.

The evidence on the part of the mother, does not contradict that act, but rather confirms it. The consideration she alleges she paid, was the same mentioned in the deed, and paid at the same time. The receipt of Moulon does not specify for what purpose the money was paid. No witness is examined to show what was the condition of the bargain between the mother and the executors, and although a sale of a slave, at that time, might be proved by parole, it must be proved by witnesses who could establish the consent of the parties, the price, and other conditions of the contract. If soon after this pretended sale, Charles Pierre had died of a disease existing at the time of the contract, and incurable, would the mother, on the evidence now exhibited, have been entitled to a redhibitory action against the heirs of Jumonville? We think not. The condition and relations of the parties have, ever since its date, conformed to the terms of the deed. While Charles Pierre was a minor, the mother exercised a control over him; but on attaining the age of majority, he appears to have acted as if *sui juris* in her presence, and with her assent. The very copy in question must have been in his possession, for more than twenty

years, as it is shown that the witness, in whose hand writing it is made out, has been dead for that length of time. He was at that time a minor, and the fair presumption is, that he obtained the paper, not from the notary, but from his mother.

It is further contended, that even if the copy be admissible, it is not legal proof of emancipation, because the Spanish law required five witnesses to such an act. In the case of Bazzi *vs.* Rose et al., 8 Martin's Reports, 149, this court held, that as between the master and the slave, five witnesses are required by Partida 4, title 22, lib. 1 ; but it does not follow, that a stranger has a right to set up such a nullity, which the Partida does not declare to be an absolute one. What-ever weight we might attach to this objection, if urged by the heirs of Jumonville, it is not entitled to much considera-tion, when pressed by a mother, and whose own title to freedom rests on a similar act, as shown by the record.

The further objection that this evidence was inadmissible, because the defendant had not pleaded his emancipation by such an act, has no weight with this court. He alleges that he was free, and that he had been free for many years. In support of that allegation, he was authorised to avail himself of any legal evidence in his favor ; and parties are not bound, in their pleadings, to specify the proofs on which they intend to rely.

*Where a person of color alleges he is free, and has been so for many years, he will be allowed to avail himself of any legal evidence in his favor, under this plea, without being bound by the pleadings to specific proofs.*

The remaining alleged ground of nullity of the will, is, that one of the witnesses was not a resident of the parish of Orleans, when the will was executed. Upon this question, which is one of fact only, there is much discrepancy in the evidence. One thing, however, is clear, that until a short time at least before the will was executed, the witness had been for many years domiciliated in the parish of Orleans. He was himself examined on the trial of this case, and swore that his residence was still, at that time, in the parish of Orleans. The evidence does not satisfy us, that he had changed his domicil at the time alluded to, and according to the principles recognised by this court, in the case of Waller *vs.* Lea, 8 Louisiana Reports, 315, the witness, for aught that

appears, might have been still amenable to the jurisdiction of the Parish Court of Orleans.

It is, therefore, ordered, adjudged and decreed, that the judgments rendered in these cases, be severally affirmed, with costs.

The counsel for the plaintiffs presented a petition for a re-hearing in this case, which, on consideration, the court refused.